UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

HENRY KOWALSKI,                )
                               )
        Plaintiff,             )
                               )
    v.                         )        2:16-cv-00160-JAW
                               )
SETERUS, INC.,                 )
                               )
        Defendant.             )

**ORDER DENYING MOTION TO DISMISS**

This case arises out of a series of communications regarding mortgage loan payments and insurance for property located in Maine that a debt collector sent to a mortgagor both after a judgment of foreclosure had been entered on the property and after the statutory redemption period had expired. The debt collector moves to dismiss the action, arguing that all of the communications were lawful and accurate. Because the Court concludes that the mortgagor has pleaded sufficient facts to establish that the debt collector violated several provisions of federal and state debt collection acts by attempting to collect money not owed by the mortgagor, the Court denies the motion to dismiss in its entirety.

I.      **BACKGROUND**

        A.      **Procedural Background**

On March 11, 2016, Henry Kowalski filed a complaint against Seterus, Inc. (Seterus) alleging violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*, the Maine Fair Debt Collection Practices Act (MFDCPA), 32

M.R.S. §§ 11001 *et seq.*, and the Maine Consumer Credit Code (MCCC), 9-A M.R.S. §§ 1-101 *et seq. Compl.* (ECF No. 1). On April 28, 2016, Seterus moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Def.'s Mot. to Dismiss for Failure to State a Claim Upon Which Relief May be Granted* (ECF No. 8). Mr. Kowalski subsequently amended his complaint on May 18, 2016, removing his claim that a violation of the MCCC is a per se violation of the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S. §§ 205-A *et seq. Pl.'s First Am. Compl.* (ECF No. 9) (*Am. Compl.*). He objected to Seterus' motion to dismiss the original complaint on the same day. *Pl.'s Obj. to Def.'s Mot. to Dismiss* (ECF No. 10). Seterus then moved to dismiss the amended complaint on May 27, 2016 and withdrew its initial motion to dismiss four days later. *Def.'s Mot. to Dismiss Pl.'s Am. Compl. for Failure to State a Claim Upon Which Relief May be Granted* (ECF No. 13) (*Def.'s Mot.*); *Notice of Withdrawal of Doc.* (ECF No. 14). On June 16, 2016, Mr. Kowalski objected to the motion to dismiss the amended complaint. *Pl.'s Obj. to Def.'s Mot. to Dismiss Pl.'s Am. Compl. for Failure to State a Claim Upon Which Relief May be Granted* (ECF No. 15) (*Pl.'s Opp'n*). Seterus replied on July 1, 2016. *Def. Seterus Inc.'s Reply Mem. in Further Supp. of its Mot. to Dismiss Pl.'s Am. Compl. for Failure to State a Claim Upon Which Relief May be Granted* (ECF No. 17) (*Def.'s Reply*).

## B.    Factual Allegations[1]

---

[1]     In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff [ ]." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

Henry Kowalski is an 84-year-old retired military veteran who lives in New Jersey with his wife Lois. *Am. Compl.* ¶ 12. Seterus, formerly known as Kyanite Financial Business Services, Inc., is a loan servicing entity incorporated in Delaware with a principal place of business in North Carolina. *Id.* ¶ 4.

On or about March 9, 2007, Mr. Kowalski executed and delivered to Aegis Wholesale Corporation (Aegis) a promissory note in the original principal amount of $408,750.00. *Id.* ¶ 13. To secure this note, Mr. Kowalski and his two sons, John C. Weber and Brad J. Kowalski, executed and delivered to Mortgage Electronic Registration Systems, Inc., acting as nominee for Aegis, a mortgage on Mr. Kowalski's real property located in Bryant Pond, Oxford County, Maine. *Id.* ¶ 14. The mortgage was assigned to OneWest Bank FSB (OneWest). *Id.* ¶ 16.

Mr. Kowalski originally bought the Bryant Pond property to move into after retirement. *Id.* ¶ 17. He and his wife began living in the property for several months each year. *Id.* ¶ 18. In or around 2009, Mr. Kowalski fell on difficult financial times and entered into a forbearance plan on the loan. *Id.* ¶ 19. He believed that he was still on the forbearance plan when OneWest initiated a foreclosure action on the property in October 2009; the action was later dismissed. *Id.* ¶ 20.

In June of 2013, OneWest filed a second foreclosure action against Mr. Kowalski and his two sons in the Maine District Court in South Paris. *Id.* ¶ 21. After failed attempts to resolve the foreclosure through the Foreclosure Diversion Program, Mr. Kowalski and his sons entered into a Stipulated Judgment of Foreclosure (Stipulated Judgment) on May 26, 2015. *Id.* ¶¶ 22, 23; *id.* Attach. 1 *Stip. J. of*

*Foreclosure and Order of Sale* (*Stip. J.*). The Stipulated Judgment provided for a waiver of any deficiency on the loan and a release of personal liability on the note. *Am. Compl.* ¶ 22; *Stip. J.* at 2. The Kowalskis had 90 days to redeem the mortgage. *Am. Compl.* ¶ 25; *Stip. J.* at 2. They vacated the property in August 2015. *Am. Compl.* ¶ 26. On August 24, 2015, the 90-day redemption period expired; the Kowalskis did not redeem the property. *Id.* ¶¶ 27-28.

After the Judgment, Mr. Kowalski and his wife were under the impression that everything was taken care of with respect to the mortgage debt and Bryant Pond property. *Id.* ¶ 29. Then, in or around May 2015, Seterus began delivering to Mr. Kowalski monthly account statements alleging over $200,000 due on the loan. *Id.* ¶ 32. The notices that Seterus sent Mr. Kowalski differ from the types of notices Seterus typically sends customers advising them of reinstatement figures. *Id.* ¶ 68; *id.* Attach. 14 *Sample Reinstatement Notice* (*Sample Notice*). Seterus sent Mr. Kowalski statements dated July 16, 2015, August 17, 2015, September 16, 2015 and November 16, 2015. *Am. Compl.* ¶¶ 33, 36-38. Seterus sent the account statements to Mr. Kowalski's P.O. Box in Sumner, Maine and Mr. Kowalski's son Brad notified him of the statements each month. *Id.* ¶¶ 34, 39.

Additionally, on or around November 20, 2015, a representative from Seterus called Mr. Kowalski at his home in New Jersey in an attempt to collect on the mortgage loan debt. *Id.* ¶ 40. Mr. Kowalski explained that he believed the debt had been taken care of in court and that he had an attorney, but the Seterus representative claimed there was no attorney on record. *Id.* ¶¶ 41-42. The

representative explained that "if Mr. Kowalski did not pay the over $200,000 he owed on the loan, Seterus would foreclose on his home"; Mr. Kowalski feared this meant that Seterus could take his New Jersey home. *Id.* ¶¶ 43-44.

In severe distress over the potential loss of his New Jersey home and Seterus' continued attempts to collect on over $200,000, Mr. Kowalski contacted his son Brad. *Id.* ¶ 45. Brad attempted to contact Seterus to understand what was happening, but Seterus refused to speak with him. *Id.* ¶ 46. Mr. Kowalski and his sons were worried that something had gone wrong at court and the Stipulated Judgment had not gone through. *Id.* ¶ 47. Brad contacted their foreclosure attorney, Andrew Kull, and retained him again to deal with Seterus' attempts to collect on the mortgage loan. *Id.* ¶ 48. Attorney Kull delivered a cease and desist letter to Seterus on November 20, 2015 by facsimile and included a copy of the Stipulated Judgment; Seterus acknowledged receipt of the facsimile on the same day. *Id.* ¶¶ 49, 51. Mr. Kowalski was relieved and hoped that Attorney Kull's actions would stop Seterus from trying to collect on the mortgage loan. *Id.* ¶ 52.

However, Seterus sent Mr. Kowalski another account statement dated December 16, 2015, and Mr. Kowalski again feared that Seterus "would not stop until the debt was paid, either by him or by taking his New Jersey home." *Id.* ¶¶ 53-54. In a letter dated January 4, 2016 to Attorney Kull, Seterus stated that it would no longer call Mr. Kowalski or his sons, or send correspondence to them, except for those "legally required." *Id.* ¶ 56. Seterus asserted in the letter that Mr. Kowalski and his sons "remain the owners of record for the collateral property . . . until the foreclosure

is complete. As a result, we will continue to mail certain legal notices until the foreclosure action is completed." *Id.* Seterus sent another account statement dated January 18, 2016 and a statement dated January 22, 2016 providing a principal and escrow reconciliation directly to Mr. Kowalski. *Id.* ¶¶ 58, 59.

In February 2016, Mr. Kowalski retained Andrea Bopp Stark, his current counsel. *Id.* ¶ 60. Attorney Stark delivered a demand letter to Seterus dated February 3, 2016 alleging violations of UTPA, the FDCPA, and the MFDCPA. *Id.* ¶ 61. Seterus received the letter on February 8, 2016 but did not reply. *Id.* ¶¶ 62-63. Seterus sent another account statement to Mr. Kowalski, c/o Attorney Stark, dated February 16, 2016, and has continued to send communications regarding the mortgage loan to Mr. Kowalski, both directly and via his attorney, since March 11, 2016, the date Mr. Kowalski filed the complaint in this Court. *Id.* ¶¶ 64-67.

In addition to the account statements, Seterus sent a notice to Mr. Kowalski, c/o Attorney Stark, dated March 17, 2016 regarding lender placed insurance on the property that stated "SETERUS IS ATTEMPTING TO COLLECT A DEBT" and that the cost of the policy, $2,850.60, was assessed to Mr. Kowalski. *Id.* ¶ 69. The property sold at a foreclosure auction on March 29, 2016. *Id.* ¶ 70. On April 26, 2016, Seterus sent two separate notices directly to Mr. Kowalski regarding the lender placed insurance stating that the premium for the policy, $2,772.71, was charged to Mr. Kowalski. *Id.* ¶ 71.

As a result of Seterus' continued attempts to collect on the mortgage loan, Mr. Kowalski has become severely distressed. *Id.* ¶ 72. He and his wife believed that

their New Jersey home was in jeopardy of being lost to foreclosure and became afraid to answer the door for fear it was the sheriff telling them to leave. *Id.* Mr. Kowalski became very agitated and has a heart condition that causes his heart to race when he is distressed. *Id.* ¶ 75. He also became very moody and reserved and stopped going out as much to eat or do yard work. *Id.* ¶ 76. He shut down and would sit inside quietly. *Id.* He was frustrated, anxious, and confused about why Seterus was continuing to try to collect the mortgage loan. *Id.* Mr. Kowalski and his wife wanted to move to a smaller, more affordable home in Maine using equity in their New Jersey home and started making plans to sell the New Jersey house when the Stipulated Judgment was entered. *Id.* ¶¶ 30-31, 73. However, when the notices started, these plans were put on hold. *Id.* ¶ 74.

## II. THE PARTIES' POSITIONS

### A. The Amended Complaint

In Counts I and II of the amended complaint, Mr. Kowalski alleges violations of identical provisions of the FDCPA and MFDCPA. *Am. Compl.* ¶¶ 78-88. Mr. Kowalski claims that Seterus violated 15 U.S.C. § 1692c(2) and 32 M.R.S. § 11012(1)(B) by communicating with him in connection with the collection of the mortgage debt when Seterus knew that he was represented by an attorney and had knowledge of the attorney's name and address. *Id.* ¶¶ 79(a), 85(a). Additionally, Mr. Kowalski claims that by delivering the notices and calling him to seek payment of money not owed by him, Seterus (1) engaged in conduct, the natural consequence of which was to harass, oppress, or abuse him, in violation of 15 U.S.C. § 1692d and 32

M.R.S. § 11013(1), *id.* ¶¶ 79(b), 85(b); (2) used false, deceptive, or misleading representations and falsely represented the character, amount, or legal status of the mortgage debt, in violation of 15 U.S.C. § 1692e and 32 M.R.S. § 11013(2), *id.* ¶¶ 79(c)-(d), 85(c)-(d); and (3) used unfair or unconscionable means to collect or attempt to collect the mortgage debt, in violation of 15 U.S.C. § 1692f and 32 M.R.S. § 11013(3), *id.* ¶¶ 79(e), 85(e). Mr. Kowalski claims that Seterus did these acts intentionally, with the purpose of coercing him to pay the alleged debt, and that the conduct constitutes a pattern and practice of violations. *Id.* ¶¶ 80-81, 86. As a result of these alleged violations, Mr. Kowalski states that Seterus is liable for declaratory judgment and actual damages, which include damages for emotional distress, statutory damages, costs, and attorney's fees. *Id.* ¶¶ 83, 88.

In Count III, Mr. Kowalski alleges a violation of the MCCC. *Id.* ¶¶ 89-92. Mr. Kowalski claims that by attempting to collect on the mortgage debt through its communications, Seterus attempted to enforce a right that it had relinquished pursuant to the Stipulated Judgment. *Id.* ¶¶ 90-91. As a result of this alleged violation, Mr. Kowalski states that he is entitled to actual damages, including emotional distress. *Id.* ¶ 92.

**B.     Seterus' Motion to Dismiss**

Seterus' first argument in support of its motion to dismiss is that it did not violate the FDCPA or the MFDCPA because it sent the communications in accordance with Maine law. *Def.'s Mot.* at 5. According to Seterus, "[a]lthough a stipulated judgment of foreclosure had entered, [Mr. Kowalski] retained title to the [Bryant

Pond] Property because the redemption period was extended pursuant to 14 M.R.S. § 6323." *Id.* Citing caselaw, Seterus explains that after the redemption period expires, a mortgagor's interest in the property is extinguished and title is vested in the mortgagee. *Id.* at 5-6. It argues that although the redemption period is traditionally 90 days, Maine law permits a mortgagee to "extend unilaterally the redemption period" before a public sale. *Id.* at 6.

It then claims that "every complained-of communication (save the April 26, 2016 insurance letter) occurred during the extended redemption period" and that "each of the seven account statements set forth an amount to redeem the mortgage and reinstate the loan in order to avoid a foreclosure sale." *Id.* It argues that "rather than being the 'unfair' letters alleged, the letters provided notice to [Mr. Kowalski] that Seterus was extending his redemption period and that he could reinstate the loan and retain title to the Property if he were to make the reinstatement payment." *Id.* at 6-7. Seterus adds that the phone call similarly concerned the reinstatement amount. *Id.* at 7 n.5. Seterus claims that because it is a servicer acting on behalf of the mortgagee, it has the authority to send these notices. *Id.* at 7. Seterus also claims that the Stipulated Judgment contemplated the extension by incorporating section 6323 and that the Stipulated Judgment conditioned the release of the debt on the foreclosure sale. *Id.*

Stating that its analysis under the FDCPA applies equally to the MFDCPA claims, *id.* at 7 n.6, Seterus argues that it did not engage in "conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with

the collection of a debt" because the natural consequence of extending the redemption period is to "temporarily benefit the [borrower] by providing an opportunity to preserve his equity of redemption . . . and avoid a foreclosure sale." *Id.* at 8-9. Seterus also argues that it did not mischaracterize the debt or use false, deceptive, and unconscionable means to collect on the debt because it was sending notice of the option to redeem, not seeking monthly payments. *Id.* at 9. Additionally, Seterus argues that the phone call did not violate the FDCPA because Mr. Kowalski's claim that he feared Seterus would foreclose on his New Jersey home "does not pass the [FDCPA's] hypothetical unsophisticated consumer test." *Id.* at 11 n.8.

Further, Seterus claims that the account statements cannot violate the FDCPA because Regulation Z of the Truth in Lending Act (TILA), 12 C.F.R. §§ 226.1 *et seq.*, requires Seterus to send periodic statements as long as Mr. Kowalski retains title. *Id.* at 10-11. It maintains that Mr. Kowalski did retain title when Seterus extended the redemption period under section 6323 through the equity of redemption upon the loan. *Id.* at 10.

Next, Seterus acknowledges that the FDCPA generally "prohibits direct communications with a debtor if the debt collector knows the debtor is represented by an attorney" but claims that the Consumer Financial Protection Bureau (CFPB) exempts from the FDCPA's scope any communications sent pursuant to 12 C.F.R. § 1026.41, which, it claims, includes the account statements. *Id.* at 12-13. Seterus also argues that Mr. Kowalski's claims based on the two insurance letters must fail because neither letter attempted to collect a debt and "the FDCPA applies only to

communications that are intended to collect a payment." *Id.* at 13-15 (collecting cases). It argues that the FDCPA disclaimer at the bottom of the letters stating "SETERUS, INC. IS ATTEMPTING TO COLLECT A DEBT" is legally irrelevant. *Id.* at 15-16.

With regard to the MCCC claim, Seterus argues that because Maine law permits Seterus to extend the redemption period, it did not attempt to enforce a debt "that has been barred by law or a final order of the Supreme Judicial Court or a court of the United States." *Id.* at 16 (citing 9-A M.R.S. § 9-403(G)). Further, Seterus acknowledges that violation of the MCCC is a per se violation of UTPA, but claims that to plead a violation of UTPA, a plaintiff must allege "loss of money or property" and Mr. Kowalski only alleges emotional harm. *Id.* at 16-17.

### C.    Henry Kowalski's Opposition

According to Mr. Kowalski, all three of his claims for relief state plausible legal claims. *Pl.'s Opp'n* at 3. First, Mr. Kowalski argues that Seterus misinterprets Maine law. *Id.* at 4. Mr. Kowalski claims that 14 M.R.S. § 6323 allows a mortgagee, such as Seterus, to permit a mortgage loan to be reinstated or redeemed after the redemption period expires, provided that the foreclosure sale has yet to occur, but that unless the mortgagor does reinstate or redeem the mortgage, title remains with the mortgagee having automatically vested upon expiration of the mandated 90-day redemption period. *Id.* at 5. He asserts that "[t]he redemption period is never extended." *Id.* Mr. Kowalski then indicates that the Stipulated Judgment was entered on May 26, 2015, so the 90-day redemption period expired on August 24,

2015, and therefore, as of that date, any interest Mr. Kowalski had in the property was extinguished. *Id.* at 6.

Mr. Kowalski then turns to Seterus' arguments that the account statements and call were not abusive, misleading, or unfair. *Id.* at 7-11. He compares his case to a recent case in the United States Bankruptcy Court for the District of Maine, *In re Collins*, 474 B.R. 317 (Bankr. D. Me. 2012), in which the court concluded that notices sent to debtors when the debtor no longer had personal liability or ownership interests constituted harassment. *Id.* at 7-8. Further, Mr. Kowalski argues that even if the intent behind the communications was in fact to provide reinstatement quotes, the notices served to mislead and deceive Mr. Kowalski. *Id.* at 8-9, 13-14. He points to language in the notices including "Amount Due," "DELIQUENCY NOTICE," "WE ARE ATTEMPTING TO COLLECT A DEBT," and "You are late on your mortgage payments." *Id.* at 8-9. He asserts that the "small-font sized explanation regarding the reinstatement amount does little to clarify and reassure a consumer in Mr. Kowalski's situation that no monies are actually owed or due, now or ever, unless he wants to re-obtain the property." *Id.* at 9. Mr. Kowalski also argues that it was reasonable for him to believe that Seterus might attempt to foreclose on his New Jersey home, especially considering the fact that he received the telephone call at his New Jersey home, the only home he owned at the time. *Id.* at 10.

Next, Mr. Kowalski argues that the monthly account statements and telephone call were not protected or required by Regulation Z of TILA. *Id.* at 11. He explains that the relevant provision of Regulation Z provides that the periodic statements shall

be transmitted "to the obligor" and that he ceased to be an obligor upon the entry of the Stipulated Judgment, expiration of the redemption period, and the agreement to waive the obligation. *Id.* Mr. Kowalski further argues that because Regulation Z is inapplicable, Seterus cannot use it as an excuse for communicating directly him despite its knowledge that he was represented by counsel. *Id.* at 12-13.

Mr. Kowalski then argues that the insurance notices were attempts to collect money related to the mortgage and were neither required nor allowed. *Id.* at 14. He points out that the insurance notices contained the language in all caps on the first page "SETERUS, INC. IS ATTEMPTING TO COLLECT A DEBT" and that the notices discussed charges to Mr. Kowalski for the cost of the insurance. *Id.* at 14-15. He asserts that a reasonable interpretation of the notices is that Seterus was attempting to collect a debt and that the true nature of the letters was aimed at collecting a debt. *Id.* at 15 (collecting cases). Mr. Kowalski maintains that because his interest was extinguished, there was no obligation to purchase insurance and so the notices were unnecessary, false, deceptive, and misleading. *Id.* at 15-16.

As to the MCCC claim, Mr. Kowalski argues that the fact that "loss of money or property are not alleged is immaterial to [his] entitlement to damages for [Seterus'] violation of the [MCCC]." *Id.* at 17. He explains that he withdrew his UTPA claim in the amended complaint and that the MCCC "has its own forms of relief available for consumers including statutory damages which is unique from the Maine UTPA." *Id.*

### D.    Seterus' Reply

In reply, Seterus states the Mr. Kowalski concedes that the communications received before August 24, 2015, before the 90-day redemption period had expired, are not actionable. *Def.'s Reply* at 2. Seterus then states that Mr. Kowalski's new claim that only the communications received after the redemption period expired are actionable is "analytically flawed and should be rejected for at least three reasons." *Id.* at 3.

First, Seterus maintains that even after the expiration period expires, a mortgagor can redeem at any point until the date of sale under 14 M.R.S. § 6323, the only difference being that the mortgagee must agree to it. *Id.* Seterus argues that if the communications during the redemption-period are not illegal, neither are the communications after the redemption period but before the sale. *Id.* Second, Seterus argues that Mr. Kowalski's claim is "irreconcilable with the plain language of [section] 6323" which provides that if a mortgagor does redeem after the redemption period but before the sale, "*all other rights of all other parties remain as if no foreclosure had been commenced.*" *Id.* (emphasis by Seterus). It claims that because one of those rights is the right to redeem, it never really expires until the sale. *Id.* Third, it says that Mr. Kowalski's argument is irreconcilable with the Stipulated Judgment, which says that Seterus waives his right to collect any deficiency balance "after the sale of the mortgaged real estate." *Id.* at 4.

Next, Seterus distinguishes this case from *In re Collins* because the latter is a bankruptcy case and does not concern section 6323. *Id.* at 4-5. Seterus also argues that the single letter Mr. Kowalski received after the foreclosure sale is not actionable

because the standard disclaimer at the bottom of the letter is legally irrelevant and the insurance letter in this case was far shorter and different from the insurance letters in the bankruptcy cases cited by Mr. Kowalski. *Id.* at 5.

Finally, Seterus maintain that Mr. Kowalski's MCCC claim fails as a matter of law because "the only 'order' that [Mr. Kowalski] identifies is the Stipulated Judgment" and under this Judgment "Seterus did not relinquish its rights until the date of sale." *Id.* at 6. Seterus also says that because Mr. Kowalski did not respond to its argument that emotional distress is not actionable under the MCCC, it waived any objection to the Court's dismissal of the claim. *Id.* It adds that Mr. Kowalski did not "put any flesh on his skeletal allegations seeking emotional distress damages in connection with his other claims" and so they too must be dismissed. *Id.*

## III. LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Under the general pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the United States Supreme Court elaborated on this pleading standard in the context of a motion to dismiss: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## IV.   DISCUSSION

### A.   Timing

The legal significance of the relationship between Mr. Kowalski and Seterus depends on timing.  In general, the relationship is defined by the terms of the agreements Mr. Kowalski and OneWest entered into and the laws applicable to those agreements.  There are three significant periods: (1) from March 9, 2007 to May 26, 2015, (2) from May 26, 2015 to August 24, 2015, and (3) from August 24, 2015 forward.

From March 9, 2007, the date on which Mr. Kowalski took out the loan from Aegis (later OneWest) secured by the mortgage on the Bryant Pond property, until May 26, 2015, the date of the state court judgment, Mr. Kowalski was a mortgagor and obligor to Aegis and then OneWest, which were mortgagee and lender.  During

this period, the legal relationship between Mr. Kowalski and OneWest was standard and unremarkable.

From May 26, 2015 to August 24, 2015, however, the relationship changed. On May 26, 2015, when the state court entered the Stipulated Judgment, Mr. Kowalski's statutory rights to the Bryant Pond property were reduced to the right to redeem the mortgage under 14 M.R.S. § 6322 within the 90-day redemption period. But the Stipulated Judgment dated May 26, 2015 contained a number of provisions that affected the rights and obligations of the parties; the Stipulated Judgment confirmed that (1) "the amounts due under the terms of [the] Note and Mortgage" were $612,786.47, (2) the prejudgment interest rate was 6.875% per annum, the per diem rate was $11.5414666, and the post-judgment interest rate was the higher of the note or statutory rate, (3) [OneWest] was awarded attorney's fees in the amount of $3,005.00 and attorney's disbursements in the amount of $928.71, (4) "if the [Kowalskis did] not pay [OneWest] the amount due, together with accrued interest and late charges as set forth above, within ninety days of the date hereof, [OneWest] shall sell the mortgaged real estate . . . and disburse the proceeds," and (5) [OneWest] was granted "exclusive possession of the real estate mortgaged to it upon expiration of the statutory ninety (90) day redemption period." *Stip. J.* at 1-2. Most importantly, the Stipulated Judgment provided:

> In consideration of [the Kowalskis] stipulating to this Judgment, [OneWest] has waived any and all right to collect any deficiency balance remaining due to [OneWest] after the sale of the mortgaged real estate and application of the proceeds of sale to the balance set forth above. Accordingly, it is ORDERED that [the Kowalskis] are released from any and all personal liability on the Note.

*Id.* at 2 (emphasis added).

The way the Court reads the present tense language of the Stipulated Judgment, as of May 26, 2015, Mr. Kowalski was no longer indebted to OneWest on the $612,786.47 loan. *Id.* ("Defendants <u>are</u> released"). Mr. Kowalski retained the right to redeem the mortgage by paying all of the amounts listed in the Stipulated Judgment plus accruing interest. But he did not have to do so and he was no longer obligated to pay OneWest anything.

Finally, once the 90-day redemption period for Mr. Kowalski's mortgage with OneWest lapsed by operation of law on August 24, 2015, OneWest became the sole owner of the Bryant Pond real estate, and Mr. Kowalski was not a debtor, a mortgagor to OneWest, or an owner of any interest in the Bryant Pond property.

For the period before May 26, 2015, OneWest (or Seterus) had the rights and obligations under the FDCPA, MFDCPA and MCCC. Once the state court entered the Stipulated Judgment releasing the Kowalskis from all personal liability on the note and OneWest waived the right to collect any deficiency balance from Mr. Kowalski, OneWest had no ongoing right to demand that Mr. Kowalski make payments on a note on which he had no personal liability. Because Mr. Kowalski retained the right to redeem until August 24, 2015, OneWest[2] had the right to periodically inform Mr. Kowalski of the pay-off amount, should he elect to exercise

---

[2]     Mr. Kowalski states that upon information and belief the mortgage loan was originally assigned to OneWest, then assigned to Ocwen Loan Servicing LLC on July 30, 2015 and then Federal National Mortgage Association on September 16, 2015. *Am. Compl.* ¶ 16. To avoid confusion, the Court refers to OneWest as the lender, but the analysis equally applies to the subsequent lenders.

his right to redeem. After August 24, 2015, OneWest was no longer a lender to Mr. Kowalski and was the sole owner of the property. It could have inquired periodically up to the point of the public sale whether Mr. Kowalski had any interest in purchasing the property either before or at the public sale, but its inquiry would have to be limited to its acknowledgement that Mr. Kowalski had no legal obligations of any kind to OneWest.

With these timeframes in mind, the Court turns to Mr. Kowalski's claims.

## B.    Counts I & II: FDCPA & MFDCPA Claims[3]

The FDCPA was enacted "to protect debtors from abusive debt collection practices." *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 41 (1st Cir. 2010). To prevail on an FDCPA claim, "a plaintiff must prove that (1) he was the object of collection activity arising from consumer debt, (2) the defendant is a debt collector within the meaning of the statute, and (3) the defendant engaged in a prohibited act or omission under the FDCPA." *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 158 (D. Me. 2011).

The parties do not dispute the Mr. Kowalski was the object of collection activity arising from consumer debt and that Seterus is a debt collector as defined by the FDCPA. The dispute is whether Seterus engaged in any prohibited acts when it sent

---

[3]    Mr. Kowalski brings claims under several provisions of the FDCPA in Count I and repeats those claims under identical provisions of the MFDCPA in Count II, so the Court will analyze these counts together. Because the MFDCPA's language almost exactly tracks the FDCPA, the Court refers only to the FDCPA, but the analysis applies equally to both claims. *See Shapiro v. Haenn*, 222 F. Supp. 2d 29, 44 (D. Me. 2002); *Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2014 WL 4594733, at *18 (D. Me. Sept. 15, 2014) (analyzing federal and state statutes together); *In re Martel*, 539 B.R. 192, 194 n.4 (Bankr. D. Me. 2015) ("The Maine FDCPA mirrors the federal Act, and therefore, my analysis applies equally to each").

account statements and insurance letters to Mr. Kowalski and when it called Mr. Kowalski about paying on his loan. Before the Court turns to the particular sections of the FDCPA that Seterus purportedly violated, it will address two overarching arguments that Seterus makes: 1) that its actions were legal and required by state law under 14 M.R.S. § 6323 and federal law under Regulation Z of TILA, and 2) that it cannot be liable under the FDCPA for any claims based on the insurance letters because these letters were not made in connection with an attempt to collect a debt.

### 1.   Communications Allowed by State and Federal Law

### a.   14 M.R.S. § 6323

Seterus' main argument in its motion to dismiss is that it did not violate the FDCPA because it communicated with Mr. Kowalski in accordance with Maine law, specifically 14 M.R.S. § 6323. *Def.'s Mot.* at 5. Seterus claims that section 6323 allows it to extend Mr. Kowalski's redemption period, thereby preserving Mr. Kowalski's title to the property, and that the account statements and telephone call were merely invitations to reinstate or redeem the mortgage loan during the extended redemption period. *Id.* at 5-6.

The Court is dubious. Seterus' position runs headlong into the language of the statute, which provides that "[u]pon expiration of the period of redemption, if the mortgagor . . . [has] not redeemed the mortgage, any remaining rights of the mortgagor to possession terminate." 14 M.R.S. § 6323(1). Furthermore, "Maine is a 'title theory' state–a mortgagee holds legal title to the property, and the mortgagor retains only the 'right to possess the premises and the equity right of redemption.'"

*In re Cormier*, 147 B.R. 285, 290 (Bankr. D. Me. 1992) (quoting *Duprey v. Eagle Lake Water & Sewer Dist.*, 615 A.2d 600, 602 (Me. 1992)). Thus, "the accepted doctrine in Maine is that a mortgage is regarded as a conditional conveyance vesting the legal title in the mortgagee." *Smith v. Varney*, 309 A.2d 229, 232 (Me. 1973) (citing *First Auburn Tr. Co. v. Buck & Wellman*, 16 A.2d 258, 260 (Me. 1940)). Indeed, "[s]uch has been the accepted doctrine in this state since it became a separate commonwealth." *First Auburn*, 16 A.2d at 260 (citing *Blaney v. Bearce*, 2 Me. 132 (1822)). The mortgagor retains "the equity of redemption, i.e., the right to redeem the property by payment of the indebtedness for which the real estate was conveyed as security. This is known as the equitable title." *Smith*, 309 A.2d at 232.

The Maine Supreme Judicial Court has used especially clear language in describing what happens to the mortgagor's equity of redemption once the period of redemption expires: it is "cut off." *Id.* ("[T]he mortgagor's interest as such in the real estate was cut off by the foreclosure and the expiration of the period of redemption"). Once a foreclosure judgment is entered, the debtor has a statutory 90-day period in which to redeem the property. 14 M.R.S. § 6322. After the statutory redemption period expires, the mortgagor's interests in the real property, including the equitable right of redemption, are "forever extinguished." *In re Cormier*, 147 B.R. at 290; *see also Bankr. Estate of Everest v. Bank of Am., N.A.*, 2015 ME 19, ¶ 20, 111 A.3d 655 (quoting *Duprey*, 615 A.2d at 604) ("When that equity of redemption has been lost by the expiration of the statutory period, nothing remains in the mortgagor except the contingency that exceptional circumstances may exist which will entitle him to

equitable relief"). Indeed, the "right of redemption, once extinguished, cannot be revived by any court, nor can the period of redemption be abridged or enlarged by operation of law."[4] *Keybank Nat'l Ass'n v. Sargent*, 2000 ME 153, ¶ 11, 758 A.2d 528.

Seterus hangs its legal hat on two statutory sentences:

> The mortgagee, in its sole discretion, may allow the mortgagor to redeem or reinstate the loan after the expiration of the period of redemption but before the public sale. The mortgagee may convey the property to the mortgagor or execute a waiver of foreclosure, and all other rights of all other parties remain as if no foreclosure had been commenced.

14 M.R.S. § 6323(1). The first sentence just says that a mortgagee may permit a mortgagor to redeem or reinstate the loan "after the expiration of the period of redemption." *Id*. It expressly says that the period of redemption is over, meaning that the mortgagor no longer has a right of redemption. Nevertheless, the mortgagee may allow the mortgagor to redeem. The first clause of the second sentence goes on to explain how to effectuate the redemption during this time–the mortgagee can either convey the property or execute a waiver of foreclosure. Significantly, the second clause of the second sentence establishes that if the mortgagee and the

---

[4]     The *Keybank* Court suggested that there are "exceptional circumstances . . . where a court of equity may provide relief, even after the 90-day redemption period has expired." *Keybank*, 2000 ME 153, ¶ 11; *see Duprey*, 615 A.2d at 604. The Maine Law Court has not described what those "exceptional circumstances" might be. However, in *Carll v. Kerr*, 89 A. 150 (Me. 1914), the Maine Supreme Judicial Court discussed *Cameron v. Adams*, 31 Mich. 426 (1875), a Supreme Court of Michigan case, and observed that "[w]here a valid legislative act has determined the conditions on which rights shall vest or be forfeited, *and there has been no fraud in conducting the legal measures*, no court can interpose conditions or qualifications in violation of the statute." *Carll*, 89 A. at 151 (emphasis supplied). Assuming theoretically that a court could act in equity in derogation of the statute to cure a fraud, there have been no exceptional circumstances alleged here, and the provision of the statute upon which Seterus relies does not call upon the exercise of the equity jurisdiction of the court.

mortgagor resolve their dispute during this period "all other rights of all other parties remain as if no foreclosure had been commenced." *Id.*

Contrary to Seterus' position, the statute does not grant or revive in the mortgagor any right of redemption after the redemption period has expired. *Id.* ("The mortgagee, *in its sole discretion*") (emphasis supplied). It merely recognizes a practicality, namely that after the redemption period has expired and before the public sale, if the lender is able to come to an accommodation with the debtor, it may do so, but in doing so, may not affect the legal rights of third parties.

Nor is the Court impressed with Seterus' second argument that the second clause of the second sentence ("and all other rights of all other parties remain as if no foreclosure had been commenced") means that Mr. Kowalski retains his equitable right of redemption. Seterus' argument attempts to squeeze the mortgagor into the term "other parties" and is not supported by the plain language of the statute. In the context of this statute, all "other" parties plainly means parties other than the mortgagee and mortgagor and has nothing to do with Mr. Kowalski's rights. Mr. Kowalski did not retain any title or interest in the property after August 24, 2015 when the statutory redemption period expired.

It strikes the Court that Seterus is trying to prove too much. A mortgagor does not have to retain a right of redemption for a mortgagee to have legitimate reason to contact its debtor during the period between the extinguishment of the equity of redemption and the public sale. The mortgagee may wish to avoid the additional cost and trouble of a public sale by negotiating a compromise with the mortgagor, and

there is no reason for the law to discourage, much less forbid, such contact.  Whether the lender's contacts with the debtor violate the FDCPA depends on a straightforward application of the terms of the statute.  The issue is whether these communications—in light of the status of the loan at the time of the contact—were abusive, misleading, or unfair, which the Court discusses below.  *See infra* Section IV.B.3.

### b.      Regulation Z of TILA

Seterus also justifies the account statements by relying on Regulation Z of TILA, arguing that the federal law requires it to send periodic statements.  *Def.'s Mot.* at 10-11.  Under Regulation Z of TILA, a servicer or mortgagee is required to send periodic statements each billing cycle for any "closed-end consumer credit transaction secured by a dwelling," such as a mortgage loan.  12 C.F.R. § 1026.41(a).  However, as Mr. Kowalski points out, this regulation comes from section 1420 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1420, 124 Stat. 1376 (2010) (codified as amended at 15 U.S.C. § 1638(f)), which provides that the periodic statements should be transmitted to the "obligor."

The problem for Seterus is that at the time the account statements were sent, Mr. Kowalski was no longer an obligor.  On May 26, 2015, the state of Maine District Court issued a judgment expressly providing that "it is ORDERED that [the Kowalskis] are released from any and all personal liability on the Note."  *Stip. J.* at 2.  The Stipulated Judgment went on to provide that OneWest (or Seterus) "waived any and all right to collect any deficiency balance remaining due to [OneWest] after the sale of the mortgaged real estate and application of the proceeds of sale to the

balance set forth above." *Id.* To state the obvious, as of May 26, 2015, Mr. Kowalski was no longer an obligor on a loan that he was no longer obligated to pay. Therefore, the Court does not agree with Seterus' argument that it was required to send Mr. Kowalski these monthly account statements.

The Court's conclusion is supported by the CFPB's interpretation of the periodic statement requirement. *See* Consumer Fin. Prot. Bureau, Bulletin 2013-12, *Implementation Guidance for Certain Mortg. Servicing Rules* at 7 n.23 (Oct. 15, 2013) (*CFPB Bulletin*) ("Servicers are not required to provide periodic statements to borrowers in bankruptcy"). It is also supported by the federal bankruptcy court's decision in *In re Collins*. In that case, a loan servicer, Marix, sent a series of letters with information about payments, property insurance, and alternatives to foreclosure after a foreclosure judgment was entered and the redemption period expired. *In re Collins*, 474 B.R. at 319. Like Seterus, Marix argued that the letters were required by state and federal law. *See id.* at 321. However, the court held that "[c]onsidering the utter absence of an obligation owed to Marix by the post-bankruptcy, post-redemption Collins' it would seem a waste of time and resources to enact and enforce legislation requiring unnecessary notices to non-obligors and non-owners." *Id.* at 321-22. Similarly here, after August 24, 2015, Mr. Kowalski was a non-obligor on the note and a non-owner of the Bryant Pond property, so it makes little sense that the law would require Seterus to send him monthly account statements.

## 2. Insurance Letters

As a final threshold matter, Seterus argues that it cannot be liable for sending the two insurance letters because neither attempted to collect a debt. *Def.'s Mot.* at 13-16. "'The basic premise of the statutory scheme' of the FDCPA is that its protection 'applies in connection with the collection of debts.'" *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 911 F. Supp. 2d 1, 48 (D. Mass. 2012) (quoting *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 23 (1st Cir. 2002)). A debt is "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

The First Circuit has not elaborated on this requirement; however, other circuit courts have held that the communication "need not itself be a collection attempt; it need only be connect[ed] with one." *See, e.g.*, *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) (internal quotations omitted). Courts look to a number of factors, including the nature of the parties' relationships, whether the communication included a demand for payment, and the purpose and context of the communications. *Krechner v. Nationstar Mortg. LLC*, No. 15-5054, 2015 WL 9260055, at *3 (E.D. Pa. Dec. 18, 2015) (citing *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385-86 (7th Cir. 2010)). The issue at the pleading stage is whether the allegations, considered alongside the letter, "plausibly state a claim that one of the animating purposes of the letter was to induce payment by the plaintiff." *Id.*

Seterus sent Mr. Kowalski two types of insurance letters. The first insurance letter dated March 17, 2016 states:

> Because we did not have evidence that you had hazard insurance on your property, we bought hazard insurance on the property and added the cost to your mortgage loan account. The policy that we bought is expiring. **Because hazard insurance is required on your property, we intend to maintain insurance on your property by renewing or replacing the insurance we bought.** The insurance we buy . . . [c]osts $2,850.60 annually.

*Am. Compl.* Attach. 15 *Insurance Letter* at 2 (Mar. 17, 2016) (emphasis in original). The letter further says that the cost of the policy purchased last year was assessed to Mr. Kowalski and that it has directed an insurance agency to purchase new coverage when that policy expires on May 1, 2016. *Id.* at 4. It then states: "***You will be charged for the cost of this insurance if we do not receive adequate proof of coverage within 45 days from the date of this letter.***" *Id.* (emphasis in original). The second insurance letter dated April 26, 2016 states that the hazard insurance was cancelled, effective April 22, 2016, but that "our records show an earned premium" for the time period of May 1, 2015 to April 22, 2016 in the amount of $2,772.71, and that "[t]his premium has been charged to you for the time the coverage was in force." *Am. Compl.* Attach. 16 *Insurance Letter* at 4 (Apr. 26, 2016).

In support of his argument that the insurance notices were made in connection with an attempt to collect a debt, Mr. Kowalski points to the disclaimer at the bottom of the letters that states: "SETERUS, INC. IS ATTEMPTING TO COLLECT A DEBT." However, as Seterus notes, the FDCPA disclaimer "does not automatically trigger the protections of the FDCPA." *See Gburek*, 614 F.3d at 386 n.3; *Maynard v. Cannon*, 401 F. App'x 389, 395 (10th Cir. 2010) ("[T]he inclusion of the FDCPA notice is legally irrelevant").

Still, the Court concludes that based on the alleged facts and the substance of these insurance letters, Mr. Kowalski has plausibly stated a claim that "one of the animating purposes of the letter was to induce payment." *See Krechner*, No. 15-5054, 2015 WL 9260055, at *3. Both letters discuss an amount owed by Mr. Kowalski for insurance on his formerly mortgaged Bryant Pond property. The first letter informs Mr. Kowalski that QBE FIRST, an insurance agency, bought insurance on the Bryant Pond property, added the cost of the policy to the mortgage loan, and plans to renew the policy at a cost of $2,850.60 annually if Mr. Kowalski does not provide proof of insurance by the policy's expiration date. The second letter cancels the insurance, but charges Mr. Kowalski a premium of $2,772.71. Although the letters do not explicitly demand payment, they tell Mr. Kowalski that he is *required* to maintain insurance on the property and then tell him that although the insurance company cancelled the insurance, he still owes a premium for the time period from May 1, 2015 until April 22, 2016. By leading Mr. Kowalski to believe he had to pay for insurance on property he no longer owned or had any legal interest in, Mr. Kowalski could be induced to make a payment for a premium he never owed.

Additionally, given the nature of the parties' relationship at the time of the communications, it is reasonable to infer that the true intent behind the letters was to induce payment. In general, the purpose behind these types of letters may be to notify the borrower of the servicer's intent to renew or cancel force-placed insurance, as required by federal regulations. *See* 12 C.F.R. § 1024.37(e), (g); *see also Preuher v. Seterus, LLC*, No. 14 C 6140, 2014 WL 7005095, at *3 (N.D. Ill. Dec. 11, 2014).

However, in this case, Mr. Kowalski had no obligation to maintain or purchase any insurance on the property. As of May 26, 2015, Mr. Kowalski had no personal obligation on the loan, and as of August 24, 2015, he no longer owned the property. OneWest was the sole owner until March 29, 2016 when Fannie Mae bought the property at the public sale. Seterus, therefore, was not required to provide any notices to Mr. Kowalski regarding insurance on the property after August 24, 2015. One can reasonably infer from these facts and the other alleged attempts to collect on the loan that the true purpose of the insurance letters was not to comply with federal regulations, but to induce payment on the loan for the cost of an insurance policy that Mr. Kowalski was not required to have. Therefore, the Court concludes that Mr. Kowalski has pleaded sufficient facts to establish that the insurance letters were made in connection with an attempt to collect a debt and fall within the purview of the FDCPA.

### 3. Alleged Violations

The Court turns to the purported violations. Mr. Kowalski alleges that Seterus violated the FDCPA by calling him and sending the account statements and insurance letters in an attempt to collect on the mortgage loan after the Stipulated Judgment was entered and the redemption period had expired. In particular, Mr. Kowalski argues that these acts violated the following provisions of the FDCPA: communicating with a debtor when he is known to be represented by an attorney, in violation of § 1692c(2); engaging in harassing, oppressive, or abusive debt collection, in violation of § 1692d; using false representation or deceptive means to collect or

attempt to collect a debt, in violation of § 1692e; falsely representing the character, amount or legal status of a debt, in violation of § 1692e(2)(A); and engaging in unfair and unconscionable means, in violation of § 1692f. Seterus claims that it was merely informing Mr. Kowalski of his options under section 6323–that he could redeem or reinstate the loan before the public sale even though the statutory redemption period had expired by paying the stated amounts. It argues that these communications were intended to benefit Mr. Kowalski, not harass him, and that they were lawful and accurate.

In determining whether a communication has violated a provision of the FDCPA, the communication "is to be viewed from the perspective of the hypothetical unsophisticated consumer." *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014). This standard protects "all consumers, including the inexperienced, the untrained and the credulous." *Id.* at 103 (citations omitted). However, the standard is an objective one, which preserves an element of reasonableness. *Id.* at 104. "A debt collector will not be held liable based on an individual consumer's chimerical or farfetched reading of a collection letter." *Id.*; *see also Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 251 (3rd Cir. 2011) ("[W]e preserv[e] a quotient of reasonableness and presum[e] a basic level of understanding and willingness to read with care") (internal quotations omitted); *Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000) ("[O]ur uneducated debtor possesses rudimentary knowledge about the financial world . . . and is capable of making basic logical deductions and inferences").

### a.    15 U.S.C. § 1692c

Mr. Kowalski first claims that Seterus violated § 1692c by communicating with him when Seterus knew he was represented by an attorney.  The relevant provision states that "a debt collector may not communicate with a consumer in connection with the collection of any debt if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address."  15 U.S.C. § 1692c(a)(2).  Both Attorney Kull and Attorney Stark communicated with Seterus about their representation of Mr. Kowalski, and Seterus was aware of this representation, as well as counsel's contact information.  *See Am. Compl.* ¶¶ 49, 51, 56, 60, 61, 62, 64.  Based on these facts, Seterus appears to have violated § 1692c of the FDCPA.

However, Seterus excuses its direct communication with Mr. Kowalski by again relying on Regulation Z of TILA.  Seterus explains that the CFPB exempts certain communications sent pursuant to Regulation Z of TILA from the FDCPA's scope.  Seterus refers to a bulletin issued by the CFPB which states, in part:

> The CFPB concludes that the FDCPA "cease communication" option does not generally make servicers that are debt collectors liable under the FDCPA if they comply with certain provisions of . . . Regulation Z (12 CFR . . . 1026.41 (periodic statement)).

*CFPB Bulletin* at 6.  However, as the Court already pointed out, Regulation Z of TILA only applies if Mr. Kowalski is an obligor and at the time of the account statements, he was not an obligor.  Thus, Seterus was not required to send the periodic statements and cannot rely on the exemption as justification for his direct communications with Mr. Kowalski.  The same goes for the insurance letters.  The CFPB also exempts

communications sent pursuant to Regulation X, including those that comply with 12 C.F.R. § 1024.37 (force-placed insurance). *Id.* However, this provision deals with "borrowers" and at the time of the letters, Mr. Kowalski was no longer a borrower. He was also no longer the owner of the property and had no obligation to maintain insurance for it. Therefore, Regulation X does not require Seterus to provide notice to Mr. Kowalski about insurance and does not justify Seterus' direct communication with Mr. Kowalski.

Moreover, even if Regulation X and Z of TILA did apply, the CFPB Bulletin is not relevant to the issue in this case. The bulletin deals with the "cease communication" option under 15 U.S.C. § 1692c(c), which is not the provision Mr. Kowalski is alleging that Seterus violated. Mr. Kowalski argues that Seterus violated 15 U.S.C. § 1692c(a)(2) by failing to send all communications to his attorney instead of directly to him. Mr. Kowalski is not arguing that Seterus should have ceased communications period. If that were the case, Seterus' argument that it was required by law to send the statements might make more sense. However, in this case, Seterus could have still complied with the regulations, if they applied, by sending the periodic statements and insurance letters to Mr. Kowalski's attorney. Neither Regulation X nor Regulation Z exempts Seterus from liability under the FDCPA for communicating directly with Mr. Kowalski.

Because Seterus makes no other objections to Mr. Kowalski's claim that Seterus communicated with him despite knowledge of his representation by a lawyer,

the Court denies the motion to dismiss Mr. Kowalski's claim in Count I under § 1692c of the FDCPA.[5]

### b.    15 U.S.C. § 1692d

Additionally, Mr. Kowalski alleges that Seterus violated § 1692d by delivering notices and calling to seek payment of monies not owed by him.  Under § 1692d, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  The FDCPA provides a non-exhaustive list of examples of the type of conduct that would violate this provision, such as the use or threat of use of violence, the use of obscene or profane language, or the causing of a telephone to ring or the engaging of any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass.  *Id.*

The timing of the relevant communications is significant to this claim.  Seterus sent the account statements at issue beginning in or around May 2015 up until March 15, 2016.  As the Court already discussed, after May 26, 2015, when the state court entered the Stipulated Judgment, OneWest had no ongoing right to demand payment on the note.  It could, however, up until August 24, 2015 when the redemption period expired, periodically inform Mr. Kowalski of the pay-off amount should he elect to exercise his right to redeem.  After that point, up until the foreclosure sale on March 26, 2015, it could have inquired whether Mr. Kowalski had any interest in purchasing the property.  However, these communications could not have been demands for

---

[5]    The Court also denies the motion to dismiss Mr. Kowalski's claim in Count II under the identical provision of the MFDCPA, section 11012(1)(B).  *See supra* note 3.

payment since Mr. Kowalski did not owe OneWest anything; they could only be inquiries of interest. Communications limited to this information would not be harassing, oppressive, or abusive.

However, Mr. Kowalski has pleaded sufficient facts that the communications in this case went beyond these limits and were not merely invitations to redeem. As Mr. Kowalski points out, the "Account Statements" include an "Amount Due" with a payment coupon. They include language such as "Payment Due Date," "You are late on your mortgage payments," "DELINQUENCY NOTICE," and "Payment Outstanding." It is reasonable for a consumer like Mr. Kowalski to believe, based on the language contained in these statements, that he owed payments when, in fact, he owed nothing on the loan. Although sending letters on a repeated basis may not generally be considered harassing or abusive since it is a natural inconvenience of debt collection, *see, e.g.*, *McDermott*, 911 F. Supp. 2d at 76-77, sending letters on a repeated basis suggesting an obligation to pay money when none is present could rise to the level of harassing or abusive conduct.

The account statements do include a footnote explaining the amount due is to reinstate the loan, but that footnote is not clear. It states:

> Our records indicate that the maturity date of the loan was accelerated and the entire amount of the loan is due. However, this statement provides the amount to bring the loan current and reinstate the loan as of the next payment due date based on the payment terms of the loan stated in the note. **If you do not reinstate the loan, the entire amount of the loan is due.** Please note that you will no longer be able to reinstate the loan after the foreclosure sale occurs.

*See, e.g., Am. Compl.* Attach. 5 *Account Statement* at 1 n.3 (Nov. 16, 2015) (emphasis

added). This same message is repeated at the bottom of the Delinquency Notice

included with the account statement and includes the phrase "[t]he total amount due

to reinstate the loan as of November 16, 2015 is $228,863.88." *Id.* at 3. This footnote

does not explain Mr. Kowalski's lack of personal liability for these, or any amounts

alleged owed on the note. It does not explain that redemption is just an option that

Mr. Kowalski may choose to exercise. In fact, the footnote says "[i]f you do not

reinstate the loan, the entire amount of the loan is due." *Id.* at 1 n.3. Viewing this

language from the perspective of a hypothetical unsophisticated consumer, the Court

interprets the statement to mean that Mr. Kowalski must either pay the

reinstatement amount or pay the entire amount of the loan, neither of which Mr.

Kowalski is required to do. This statement differs from the reinstatement notice that

Mr. Kowalski alleges is typically sent to consumer. *Am. Compl.* ¶ 68; *Sample Notice.*

By repeatedly sending statements suggesting a payment was due, when in actuality

no payments were due, on a loan for which Mr. Kowalski no longer had any personal

liability, one can reasonably infer that Seterus was engaging in conduct, the natural

conduct of which was to harass, oppress or abuse Mr. Kowalski.

The Court's conclusion is further supported by Seterus' other communications

with Mr. Kowalski during this period. On top of the monthly account statements, a

representative of Seterus called Mr. Kowalski and told him that they would foreclose

on his home if he did not pay the over $200,000 due on the loan, something Seterus

had no power to do considering the prior entry of the Stipulated Judgment. This call

caused Mr. Kowalski to fear that Seterus could foreclose on his New Jersey home. The Court disagrees with Seterus that this fear was unreasonable. The representative's alleged statements during the call, which was made to Mr. Kowalski's New Jersey home, were vague, and the New Jersey home was the only one that Mr. Kowalski owned at the time. Moreover, in addition to the phone call and account statements, Seterus sent Mr. Kowalski insurance letters, even after the property had been sold at the foreclosure sale, charging Mr. Kowalski for the cost of insurance on property he did not own and in which he lacked any interest. When viewing all of the communications together, it is reasonable to infer that the statements were not merely notices of the option to redeem the loan, but an attempt to harass Mr. Kowalski into paying on a debt that he did not owe. *See In re Collins*, 474 B.R. at 321 (debiting a consumer's discharged account with insurance obligations that were the responsibility of the mortgagee constitutes harassment proscribed by a discharge injunction). Therefore, Mr. Kowalski has pled sufficient facts to survive a motion to dismiss his claim under § 1692d.[6]

### c.     15 U.S.C. § 1692e, e(2)(A)

Mr. Kowalski also alleges that Seterus' communications violated § 1692e of the FDCPA. Under this provision, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Specifically, the act prohibits a debt collector from providing a "false representation of the character, amount, or legal status of any debt." *Id.* §

---

[6]     The Court also denies the motion to dismiss Mr. Kowalski's claim in Count II under the identical provision of the MFDCPA, section 11013(1). *See supra* note 3.

1692e(2)(A).  A representation is deceptive "when it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Waters v. Kream*, 770 F. Supp. 2d 434, 436 (D. Mass. 2011) (quoting *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2d Cir. 1996)).

The Court concludes that Mr. Kowalski has pleaded sufficient facts that Seterus used false, deceptive, or misleading representations through its communications.  The account statements use language such as "You are late on your mortgage payments" and "Failure to bring your loan up-to-date may result in fees, foreclosure, and the loss of your home," which are false statements given the fact that at the time they were sent, the Stipulated Judgment had been entered and Mr. Kowalski had been discharged from all personal liability on the loan.  Additionally, nowhere do the statements explain that Mr. Kowalski had no personal liability on the loan or legal obligations to OneWest.  In fact, they suggest the opposite by stating "If you do not reinstate the loan, the entire amount of the loan is due."  Again, this language can be reasonably read to mean that Mr. Kowalski had an obligation to make a payment on his loan, which is inaccurate.  *See Waters*, 770 F. Supp. 2d at 436; *see also Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003) ("In short, by asserting [plaintiff] owed a debt that no longer existed, on its face the letter was false").  Even after a careful reading of the statements, it is easy to see how a hypothetical unsophisticated consumer could be misled by these statements into believing that he still owed on the loan.

Moreover, according to Mr. Kowalski, a Seterus representative called him on or around November 20, 2015 and told him he had to make payments on his mortgage loan or they would foreclose on his home. This statement, accepted as true for the purposes of this motion, is false. At the time of the telephone call, the Stipulated Judgment had already been entered on the Bryant Pond property and the statutory redemption period had expired. Mr. Kowalski was not required to make any payments on his loan. He no longer owned the property. He could have attempted to purchase the property up until or at the foreclosure sale. However, based on the alleged facts, the representative never explained this option to Mr. Kowalski. Instead, the Seterus representative falsely implied that if Mr. Kowalski did not make a loan payment, it could foreclose on his home. By doing so, the representative misrepresented the legal status of the loan. *See Turner*, 330 F.3d at 995. Furthermore, as pointed out earlier, the only home Mr. Kowalski owned as of November 20, 2015 was his home in New Jersey, and Mr. Kowalski reasonably could have taken the Seterus representative to be referring to his New Jersey home.

Similarly, Mr. Kowalski has pled sufficient facts that the insurance letters were false or misleading. As already explained, at the time Seterus sent the insurance letters, Mr. Kowalski was a non-owner and non-obligor and had no obligation to purchase or pay for insurance on the Bryant Pond property. In fact, part of the premium assessed to Mr. Kowalski was for a period of time after the property had been sold at the foreclosure sale. Because Mr. Kowalski did not owe any money on the loan or for insurance, the insurance letters appear to misrepresent the legal

status of the loan and the amount of debt owed by Mr. Kowalski. *See id.*; *see also In re Perviz*, 302 B.R. 357, 372 (Bankr. N.D. Ohio 2003) ("[T]hose letters informing the Debtors that they were liable for the payment of insurance on a house that they had both abandoned in bankruptcy and physically vacated, would undoubtedly have been met with some degree of consternation by a similarly situated debtor").

In sum, the Court concludes that Mr. Kowalski has pled sufficient facts to establish his claim under § 1692e of the FDCPA.[7]

### d.      15 U.S.C. § 1692f

Mr. Kowalski also alleges a violation of § 1692f of the FDCPA, which provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The FDCPA does not define "unfair or unconscionable means," but it does provide examples of conduct that could violate the provision. *Id.* For example, it is a violation to collect any amount unless such amount is expressly authorized, or to take or threaten to take any non-judicial action to effect dispossession or disablement of property if there is no present right to possession. *Id.* § 1692f(1), (6). Other courts have defined "unfair or unconscionable means" by relying on the plain meaning of the terms. The meaning of "unfair" is "marked by injustice, partiality, or deception." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010) (quoting *Merriam-Webster Online Dictionary* (2010)). The meaning of "unconscionable" is "having no conscience," unscrupulous,"

---

[7]      The Court also denies the motion to dismiss Mr. Kowalski's claim in Count II under the identical provision of the MFDCPA, section 11013(2). *See supra* note 3.

"showing no regard for conscience," or "affronting the sense of justice, decency, or reasonableness." *See id.* (quoting BLACK'S LAW DICTIONARY 1526 (7th ed. 1999)).

For the same reasons as discussed with respect to Mr. Kowalski's other claims under the FDCPA, the Court concludes that Mr. Kowalski has pleaded sufficient facts to survive a motion to dismiss on this claim. Based on the alleged facts, which the Court assumes are true for purposes of this motion, Seterus sent Mr. Kowalski monthly statements that suggest he owes money for a loan on which he had no personal liability. On top of these monthly statements, a representative called Mr. Kowalski and told him they could foreclose on his home if he did not pay the amount due, even though Mr. Kowalski did not owe any amount on the loan and his property had already been foreclosed, leading Mr. Kowalski to believe that he could lose his current home. Furthermore, Seterus charged Mr. Kowalski over $2,000 for insurance on a property for which he was a non-obligor and non-owner. Taking these facts as true, it is reasonable to infer that Seterus was attempting to deceive Mr. Kowalski into making payments on a loan for which he was no longer liable, and thus using unfair or unconscionable means to collect a debt. Therefore the Court denies Seterus' motion to dismiss Mr. Kowalski's claim under § 1692f.[8]

### C. Count III: MCCC Claim

In Count III of the amended complaint, Mr. Kowalski alleges that Seterus violated the MCCC. Under the MCCC, a person cannot, in attempting to collect an alleged debt arising from a consumer credit transaction, "claim, attempt, or threaten

---

[8]     The Court also denies the motion to dismiss Mr. Kowalski's claim in Count II under the identical provision of the MFDCPA, section 11013(3). *See supra* note 3.

to enforce a right that has been barred by law or a final order of the Supreme Judicial Court or a court of the United States." 9-A M.R.S. § 9-403(1)(G). An aggrieved consumer has the right to recover actual damages from any person who violates section 9-403. *Id.* § 9-405.

Seterus first argues that it did not violate the MCCC because section 6323 permits Seterus to extend the redemption period to benefit Mr. Kowalski and the account statements were merely invitations for Mr. Kowalski to redeem during the extended period. The Court has already addressed this argument. First of all, section 6323 does not extend the redemption period. Secondly, the language and structure of the account statements suggest that they were more than mere invitations to redeem; they were attempts to collect on a debt no longer owed by Mr. Kowalski. This interpretation is reinforced by the phone call in which Mr. Kowalski alleges the Seterus representative said that Seterus would foreclose on his home if he did not pay the over $200,000 owed on the loan. At the time of these communications, the state court had entered a Stipulated Judgment releasing Mr. Kowalski from all personal liability on the note. Therefore, these facts, taken as true, support the reasonable inference that Seterus was trying to collect on a debt that was barred by law.

Seterus also argues that the MCCC does not permit emotional damage awards and because Mr. Kowalski has not shown any actual damages, the claim should be dismissed. Seterus premises its argument on the fact that an individual cannot recover for emotional distress under Maine's UTPA. However, as Mr. Kowalski

points out, he removed his claim under UTPA. Additionally, Maine's UTPA expressly states that a plaintiff must suffer "loss of money or property," 5 M.R.S. § 213, and courts have interpreted UTPA to exclude emotional distress. *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 613 F. Supp. 2d 108, 132 n.130 (D. Me. 2009), *rev'd on other grounds*, 659 F.3d 151 (1st Cir. 2011).

By contrast, nothing in the MCCC requires loss of money or property; it just says "actual damages." *See* 9-A M.R.S. § 9-405. Courts have interpreted actual damages to include compensation for emotional distress under similar acts. *See, e.g., French v. Corp. Receivables, Inc.*, 489 F.3d 402, 404 (1st Cir. 2007) (FDCPA); *Moore v. Mortg. Elec. Registration Sys., Inc.*, 848 F. Supp. 2d 107, 122 (D. N.H. 2012) (RESPA). Therefore, the Court does not interpret the MCCC to exclude emotional distress damages. The Court concludes that Mr. Kowalski has pleaded sufficient facts to sustain a plausible claim for relief under the MCCC.

## V.    CONCLUSION

The Court hereby DENIES the Defendant's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 13).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 9th day of January, 2017